**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| Technology Business Solutions LLC, |
| Plaintiff |
| v. |
| StoneTurn Group LLP, StoneTurn Group LLC, Mark Wyzykowski, Eanna Flannery, Ian Muulrennan, Sarah Mulrennan, and Anthony Green, |
| Defendants |

Civil Action No. 26-cv-13530

**VERIFIED COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

While working as a senior employee at Technology Business Solutions LLC ("**TBS**"), Mark Wyzykowski conspired with other TBS employees and longtime TBS client StoneTurn Group ("**StoneTurn**") to sabotage TBS operations and to misappropriate TBS assets in an effort to bring in house at StoneTurn the services that TBS had been providing to StoneTurn, thereby enriching Wyzykowski and his co-conspirators. Wyzykowski and the other individual co-conspirators then left TBS and went to work for StoneTurn, where they caused StoneTurn to terminate its relationship with TBS, bringing the work it had contracted to TBS in house. In furtherance of this conspiracy, Wyzykowski, Ian Mulrennan ("**I. Mulrennan**"), Sarah Mulrennan ("**S. Mulrennan**"), Eanna Flannery, and Anthony Green tortiously interfered with TBS's relationships with its employees and clients; misappropriated TBS's trade secrets; breached contractual obligations; and violated the computer fraud and abuse act through

1

unauthorized access to and manipulation of TBS's computer systems; breached their duties of loyalty to TBS; converted TBS assets for their personal use. In addition, co-conspirators I. Mulrennan, S. Mulrennan, Flannery, and Green committed acts of libel against TBS, including posting online the false accusation that TBS did not pay wages on time. Further, all of the co-conspirators, including StoneTurn, engaged in unfair business practices, using misappropriated TBS trade secrets — including TBS's confidential data and customer list — to operate StoneTurn's business. The Defendants provided StoneTurn with extensive knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations so that StoneTurn would cancel its contract with TBS and hire the Defendants.

## PARTIES

1.   Plaintiff Technology Business Solutions, LLC ("**TBS**") is an information technology services firm with more than 27 years of experience providing sophisticated technology solutions to businesses ranging from small local enterprises to large national corporations. Its principal office at 3000 Atrium Way, Suite 108, Mt Laurel, New Jersey, 08054. It was founded in 1995 by John Meyer.

2.   Defendant Mark Wyzykowski is a resident of New Jersey residing at 743 Frann Road, Toms River, New Jersey, 08753.

3.   Defendant StoneTurn Group, LLP is a Massachusetts Limited Liability Partnership with a registered address at 75 State Street, Suite 1710, Boston, Massachusetts, 02109 and Defendant StoneTurn Group, LLC is a Massachusetts Limited Liability Company with a registered address at 75 State Street, Suite 1710, Boston, Massachusetts, 02109  (collectively, "**StoneTurn**").

4.   Defendant Ian Mulrennan is a resident of Ireland residing at 165 Kimmage Road, West Dublin, Ireland, 12 D12 V602.

2

5.  Defendant Sarah Mulrennan is a resident of Ireland residing at 165 Kimmage Road, West Dublin, 12 D12 V602.

6.  Defendant Eanna Flannery is a resident of Ireland residing at Rosmeen Court, Apartment 5, Salthill Road, Lower Galway, H91 AH9.

7.  Defendant Anthony Green is a resident of New Jersey residing at 115 Laureba Ave., Stratford, New Jersey, 08084.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction under 18 U.S.C. § 1836 et seq. (Defend Trade Secrets Act); 18 U.S.C. § 1030 et seq. (Computer Fraud and Abuse Act); and 28 U.S.C. § 1331 (federal question).

9.  This Court has supplemental jurisdiction of any additional claims under 28 U.S.C. § 1367 because such claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

10. This court has personal jurisdiction over Defendant StoneTurn because its principal place of business is in Boston, Massachusetts, which is within this district.

11. This court has personal jurisdiction over Defendant Wyzykowski because he entered into an employment contract with StoneTurn, which is based in Massachusetts. The contract with StoneTurn and other acts relating to Wyzykowski's relationship with StoneTurn form the basis for this complaint.

12. This court has personal jurisdiction over Defendant I. Mulrennan because he entered into an employment contract with StoneTurn, which is based in Massachusetts. The contract with StoneTurn and other acts relating to I. Mulrennan's relationship with StoneTurn form the basis for this complaint.

3

13. This court has personal jurisdiction over Defendant S. Mulrennan because she entered into an employment contract with StoneTurn, which is based in Massachusetts. The contract with StoneTurn and other acts relating to S. Mulrennan's relationship with StoneTurn form the basis for this complaint.

14. This court has personal jurisdiction over Defendant Flannery because he entered into an employment contract with StoneTurn, which is based in Massachusetts. The contract with StoneTurn and other acts relating to Flannery's relationship with StoneTurn form the basis for this complaint.

15. This court has personal jurisdiction over Defendants Green, Wyzykowski, Flannery, I. Mulrennan, and S. Mulrennan because they were employed by TBS while it had a Boston office, were aware TBS had a Boston office, were aware that TBS's President John Meyer worked out of TBS' Boston office, and they communicated by phone and email with Boston-based TBS staff on a daily basis, including John Meyer, while being aware that they were working with colleagues who were based in Boston, Massachusetts.

16. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because StoneTurn is a resident is in the District of Massachusetts, all of the Defendants other than Green are employed by StoneTurn, and this case arises out of actions relating to their employment by and other acts relating to StoneTurn.

17. The Defendants had notice, and therefore it was foreseeable, that they could be hauled into a Massachusetts court because, as alleged with more specificity herein, they voluntarily and knowingly entered into a business relationship and extensively communicated with StoneTurn with the knowledge that it resided in Massachusetts and it would conduct its part of the parties' business relationship in Massachusetts. As such, the Defendants purposely availed themselves of

4

the laws and protections of the Commonwealth of Massachusetts, and the personal jurisdiction that comes along with it.

18. Defendants derive substantial income from services sold to and used by corporations in the Commonwealth of Massachusetts.

19. The Court has personal jurisdiction over the Defendants because the claims at bar relate to the Defendants' business transactions in the Commonwealth. The Defendants have regularly done business within the Commonwealth through their transactions with the StoneTurn, including without limitation their employment with StoneTurn.

20. The Court has personal jurisdiction over the Defendants because the claims at bar relate to the Defendants' business transactions in the Commonwealth. The Defendants have regularly done business within the Commonwealth through their transactions with the StoneTurn, including without limitation their use of TBS' trade secrets to benefit StoneTurn.

<u>**STATEMENT OF FACTS**</u>

<u>**TBS's Formation and Leadership**</u>

21. In 1992, while working as a Senior Director at CBS Television John Meyer became aware of the growing need for information technology support services as the industry rapidly expanded.

22. After leaving CBS in 1993, Meyer began planning and laying the foundations for an IT support services company, which he incorporated as Technology Business Solutions, LLC in 1995.

23. Over the course of the next two-plus decades, Meyer grew TBS into a multi-million dollar company with 22 employees.

5

24. By 2017, TBS had grown so much that Meyer decided to hire an administrator to help manage the company.

25. In May of 2017, Meyer hired Hui Ma in as TBS's Helpdesk Administrator.

26. John Meyer has been the President of TBS since its founding.

27. Ma works closely with Meyer to perform many of the administrative tasks at TBS.

### TBS's Development and Protection of Confidential Business Information

28. Throughout its decades of continuous operation, TBS has developed proprietary tools and methods for addressing client needs and has accumulated a vast database of information on client interactions and TBS' delivery of services to its clients, including without limitation its client and employee lists (collectively, "**Proprietary Business Information**").

29. TBS's Proprietary Business Information is the product of thousands of hours of work and is TBS's most valuable asset.

30. The nature of TBS's business requires its clients to entrust TBS and its personnel with access to sensitive business information, computer systems, networks, data, and other valuable resources (collectively, "**Confidential Client Information**").

31. TBS takes extensive measures to protect the security and confidentiality of its Proprietary Business Information and its clients' Confidential Client Information (collectively, "**Protected Information**")

32. TBS's efforts to protect the security and confidentiality of Protected Information include restricting access to Protected Information to TBS employees whose work requires such access, informing employees of the confidential nature of Protected Information, and by storing Protected Information on secure platforms that cannot be accesses without an authorized

username, password, and multi-factor authentication. These secure platforms include Microsoft OneDrive, Microsoft SharePoint, and Microsoft Teams.

33. TBS's reputation for maintaining the confidentiality of Confidential Client Information is essential to its ability to attract and retain clients.

34. TBS's access to and protection of its Proprietary Business Information is essential to its ability to maintain reliable systems, to control costs, to respond promptly to technological problems, to protect its competitive advantages, and to its ability to attract and retain clients.

### Defendants' Relationships with TBS

35. StoneTurn became a TBS client of TBS in June of 1997 and was a client continuously from that time until it severed its relationship with TBS in February, 2025.

36. TBS serviced StoneTurn for decades without any significant issues or complaints.

37. Over the course of StoneTurn's more than 27 years as TBS client, StoneTurn paid TBS approximately $6 Million in fees.

38. TBS hired Wyzykowski to work at its help desk in June of 2006.

39. Wyzykowski's starting annual salary at TBS was $65,000.

40. Meyer promoted Wyzykowski to Managing Director in 2017, entrusting him with management responsibilities and access to confidential TBS information.

41. Wyzykowski worked continuously for TBS from June 2006 through July 30, 2023.

42. As a TBS employee, Wyzykowski serviced StoneTurn from 2008 until he left TBS on July 30, 2023.

43. Wyzykowski resigned from TBS on July 30, 2023.

44. Wyzykowski began working for StoneTurn, on July 31, 2023.

45. Green began working for TBS in 2014.

46. Green's starting annual salary at TBS $35,000.

47. As a TBS employee, Green serviced StoneTurn from his hiring at TBS in 2014 through his resignation on February 26, 2025.

48. Green worked continuously for TBS from his hiring in 2014 through February 26, 2025.

49. I. Mulrennan was hired as TBS's Europe Project Manager on June 1, 2015.

50. I. Mulrennan's starting annual salary at TBS was $31,000.

51. I. Mulrennan worked continuously for TBS from 2015 through his resignation from TBS on January 10, 2025.

52. As a TBS employee, I. Mulrennan serviced StoneTurn from his hiring at TBS in 2015 through his resignation from TBS in 2025.

53. I. Mulrennan worked closely with Wyzykowski on multiple projects during their employment at TBS.

54. I. Mulrennan maintained a personal relationship with Wyzykowski outside of work during their employment at TBS.

55. From January 2, 2025 to January 10, 2025, I. Mulrennan refused to do any work for TBS despite drawing a TBS salary throughout this time period.

56. On January 7, 2025, Ma and John Meyer informed I. Mulrennan that his team's billing was under review due to inconsistencies in hours worked and pay rates.

57. I. Mulrennan's resigned shortly after Ma and John Meyer informed him that his team's billing was under review.

58. On January 10, 2025, I. Mulrennan resigned from TBS.

59. Upon information and belief, I. Mulrennan secretly became a StoneTurn employee in late 2024 while he was still employed by TBS.

60. By March 5, 2025, I. Mulrennan was openly employed by Stone Turn.

61. Flannery began working for TBS on August 1, 2016, as TBS's Europe Senior Technical Engineer.

62. Flannery's starting annual salary at TBS was $31,000.

63. Flannery worked continuously for TBS from his hiring in 2016 through his resignation on January 10, 2025.

64. As a TBS employee, Flannery serviced StoneTurn from his hiring at TBS in 2016 through January 10, 2025.

65. Flannery worked closely with Wyzykowski on multiple projects during their employment at TBS.

66. Flannery maintained a personal relationship with Wyzykowski outside of work during their employment at TBS.

67. From January 2, 2025 to January 10, 2025, Flannery refused to do any work for TBS despite drawing a TBS salary throughout this time period.

68. On January 7, 2025, Ma and Meyer informed Flannery that his billing was under review due to inconsistencies in his hours worked and pay rates.

69. Flannery resigned shortly after Ma and Meyer informed him that his team's billing was under review.

70. On January 10, 2025, Flannery resigned from TBS.

71. Upon information and belief, Flannery secretly became a StoneTurn employee in late 2024 while he was employed by TBS.

72. Flannery became a StoneTurn employee no later than on March 5, 2025.

73. S. Mulrennan began working for TBS on January 2, 2018 as a Data Integrity Manager.

74. S. Mulrennan's starting annual salary at TBS was $29,500.

75. S. Mulrennan worked continuously for TBS from 2018 through January 10, 2025.

76. As a Data Integrity Manager, S. Mulrennan had extensive managerial responsibility and access to Protected Information.

77. S. Mulrennan worked with StoneTurn's account while employed at TBS.

78. S. Mulrennan worked closely with Wyzykowski on multiple projects during their employment at TBS.

79. S. Mulrennan maintained a personal relationship with Wyzykowski outside of work during their employment at TBS.

80. From January 2, 2025 to January 10, 2025, S. Mulrennan refused to do any work for TBS despite drawing a TBS salary throughout this time period.

81. On January 7, 2025, Ma and Meyer informed S. Mulrennan that her billing was under review due to inconsistencies in hours worked and pay rates.

82. S. Mulrennan resigned from TBS on January 10, 2025, just three days after Ma and Meyer informed her that her team's billing was under review.

83. Upon information and belief, S. Mulrennan secretly became a StoneTurn employee in late 2024 while she was employed by TBS.

84. S. Mulrennan became a StoneTurn employee no later than on March 5, 2025.

85. On February 28, 2025, StoneTurn's Vice President of Operations Kevin Williams emailed TBS stating that StoneTurn had decided to terminate its IT support services with TBS effective March 31, 2025.

86. Throughout their employment at TBS, Wyzykowski, Green, Flannery, I. Mulrennan, and S. Mulrennan had access to portions of TBS's Protected Information, as necessary to complete their job duties.

87. In addition to the TBS's protected information that Wyzykowski had access to based on his job duties, he was able to gain access to additional TBS Protected Information with the assistance of Green.

88. At the time that Green provided Wyzykowski with access to additional TBS Protected Information, he knew that Wyzykowski was no longer employed by TBS and was not authorized to access that information. Green also knew that Wyzkowski intended to provide that information to StoneTurn.

89. Wyzykowski, Flannery, I. Mulrennan, and S. Mulrennan provided TBS's protected information to StoneTurn without authority to do so and with the knowledge that they were breaching their duties to TBS in providing that information to StoneTurn.

90. StoneTurn's termination of its contract with TBS was caused by Defendants' tortious acts and contract breaches.

91. Had Wyzykowski not provided StoneTurn with access to TBS's confidential business information, StoneTurn would not have been able to bring the services provided by TBS in house so quickly.

92. Had StoneTurn not conspired with Wyzykowski, StoneTurn would not have been able to bring the services provided by TBS in house so quickly.

93. Had Wyzykowski, Flanery, I. Mulrennan, and S. Mulrennan not breached their contracts with TBS, StoneTurn would not have been able to bring the services provided by TBS in house so quickly.

11

94. Had the individual Defendants not tortiously interfered with TBS's relationship with StoneTurn, StoneTurn would not have terminated its relationship with TBS when it did.

**Defendants' Conversion of TBS Funds Through Fraudulent Means**

95. From 2018 to 2024, I. Mulrennan misappropriated TBS funds by giving fraudulent and unauthorized raises to himself and his team, by conspiring with Flannery and S. Mulrennan to inflate their hours worked, and by making unauthorized increases to their hourly rates.

96. From 2018 to 2024, I. Mulrennan covered up his scheme to overcompensate himself and other members of his team by deleting payroll records, so that fraudulent and inflated transactions could not be traced.

97. From 2018 to 2024, I. Mulrennan further concealed his fraudulent, unauthorized and inflated payments to himself and his team by not entering them into the third-party time tracking tool provided by TBS to track his team's hours.

98. On August 23, 2024, I. Mulrennan and Flannery discussed through Microsoft Teams messages how they "came up" with the number of hours worked on a project, communicating these hours to Meyer as being legitimate, despite the actual number of hours worked being lower.

99. On or about October 17, 2024, I. Mulrennan increased Flannery's rate of pay by twenty percent without authorization and without the knowledge or approval of his supervisors.

100. On October 17, 2024, I. Mulrennan informed Flannery of this increase in compensation by through Microsoft Teams, telling him that he "put in a 20% increase" for Flannery and "said nothing."

101. In January of 2025, Ma and Meyer conducted a billing review of I. Mulrennan's team.

102.     Through the billing review of I. Mulrennan's team, Meyer and Ma learned that I. Mulrennan had billed TBS for more hours than he and his team worked and that he had discussed this fraudulent activity with S. Mulrennan and Flannery.

103.     Through the billing review, TBS discovered that I. Mulrennan received a yearly compensation that was considerably higher than his authorized salary of €31,000. Specifically, I. Mulrennan arranged for himself to be paid €50,549.91 in 2018, €52,717.52 in 2019, €58,735.40 in 2020, €49,598.48 in 2021, €63,165.64 in 2022, €60,342.06 in 2023, and €70,254.49 in 2024.

104.     I. Mulrennan fraudulently paid himself and his team more than their authorized salaries without TBS's knowledge through the use of a number of tactics, including paying them for more hours than they worked and using inaccurate euro to U.S. dollar conversion rates.

105.     Through the billing review, TBS discovered that from 2018 to 2025 Flannery received a yearly compensation which was higher than his authorized salary of $31,000. Specifically he was paid €35,442.03 in 2018, €44,527.21 in 2019, €45,216.10 in 2020, $39,559.97 in 2021, €52,944.92 in 2022, €50,017.70 in 2023, and €55,974.60 in 2024.

106.     Through the billing review, TBS discovered that from 2018 to 2025 S. Mulrennan was paid far more than her authorized annual salary of $29,500. Specifically, she was paid €36,440.31 in 2018, €38,245.57 in 2019, €42,269.20 in 2020, $41,100.30 in 2021, €53,398.50 in 2022, €48,632.14 in 2023, and €48,117.27 in 2024.

## **Defendants' Breaches of Their Contractual Obligations to TBS**

107.     Wyzkowski, Flanery, and I. Mulrennan, breached their contractual obligations to TBS not to solicit business from TBS customers or clients.

108.      Wyzkowski breached his contractual obligation not to induce TBS employees to stop working at TBS.

109.    In 2015, I. Mulrennan agreed to TBS's Employee Contract, including its non-solicitation provision.

110.    In 2016, Flannery agreed to TBS's Employee Contract, including its non-solicitation provision.

111.    In 2018, I. Mulrennan agreed to the terms of TBS' Employee Handbook, including its non-compete and non-solicitation provisions.

112.    In 2018, Flannery agreed to the terms of TBS' Employee Handbook, including its Non-Compete and son-solicitation provisions.

113.    In 2006, Wyzkowski agreed to TBS' Employee Contract, including its non-solicitation clause.

114.    In 2017 Wyzkowski agreed to the terms of TBS' Employee Handbook, including its non-compete and non-solicitation provisions.

115.    Wyzkowski was well aware of the terms of the Employee Handbook and understood that he was bound by it, having helped to develop and distribute it.

116.    In November 2017, Wyzkowski distributed the Employee Handbook via email to TBS employees for their review and signature.

117.    On January 12, 2018, Wyzkowski emailed TBS employees urging them to sign the Employee Handbook and return the signed copy to Meyer by the end of day.

118.    The TBS employee handbook that I. Mulrennan, Wyzkowski, and Flannery signed contained a non-solicitation covenant.

119.    The TBS non-compete agreement that I. Mulrennan, Wyzkowski, and Flannery signed contained a non-solicitation covenant.

14

120. Section 2 of the TBS non-compete agreement signed by I. Mulrennan, Wyzykowski, and Flannery includes a non-solicitation covenant that states "[f]or a period of one year after the effective date of this Agreement, Employee will not directly or indirectly solicit business from, or attempt to sell, license or provide the same or similar products or services as are now provided to, any customer or client of Technology Business Solutions, LLC, nor shall employee use Technology Business Solutions, LLC's existing client's demographic and confidential information to solicit and provide quotes and/or transfer business to any competing entity. Further, for a period of one year after the effective date of this Agreement, employee will not directly or indirectly solicit, induce or attempt to induce any employee of Technology Business Solutions, LLC to terminate his or her employment with Technology Business Solutions, LLC."

121. The non-solicitation covenant in Section 9 of the TBS employment contract signed by I. Mulrennan, Wyzykowski, and Flannery states that "[e]mployee shall not solicit the employment of any customer of the Company, during the term of this Agreement and for a period of eighteen (18) months following the date of termination of this Agreement by either party for whatever reason (such period not to include any period(s) of violation or period(s) of time required to enforce any obligations contained in this Agreement), without obtaining the prior written consent of the Company. No provisions within this Section 12 shall limit any right which the Company may have under any statute or at common law."

122. I. Mulrennan never obtained the written consent of TBS to solicit the employment of any TBS customer.

123. Wyzykowski never obtained the written consent of TBS to solicit the employment of any TBS customer.

124.    Flannery never obtained the written consent of TBS to solicit the employment of any TBS customer.

125.    StoneTurn was a TBS customer at the time Wyzykowski, I. Mulrennan, and Flannery solicited the employment of StoneTurn as part of their plan to leave TBS for StoneTurn and provide the services that TBS had been providing to StoneTurn directly to StoneTurn in house.

126.    Wyzykowski breached the non-solicitation provision of his agreement with TBS by conspiring with StoneTurn to end its relationship with TBS, such that Wyzykowski would provide StoneTurn with the same services directly that he had provided on behalf of TBS as a TBS employee and then by providing those services directly.

127.    Wyzykowski breached the non-solicitation provision of his agreement with TBS by soliciting other TBS employees to leave TBS and go to work directly for StoneTurn in 2023.

128.    Wyzykowski breached his employment contract by working for StoneTurn starting July 31, 2023, immediately after he stopped working for TBS.

129.    Wyzykowski solicited I. Mulrennan, Flannery, and S. Mulrennan to stop working at TBS and instead go to work at StoneTurn in 2023.

**Defendants' Sabotage of TBS' Operations**

130.    In 2017, John Meyer hired Ma as Helpdesk Administrator to provide management assistance.

131.    Starting soon after Ma was hired in 2017, Wyzykowski attempted to undermine Ma's authority.

132. In or around September 2017, Wyzykowski, through multiple conversations, pushed another colleague, Alexandra Cole, to resist John Meyer's decision to split a project between Cole and Ma.

133. From 2021 to 2024, Wyzykowski refused to work with Ma.

134. On December 20, 2024, Wyzykowski sent a Microsoft Teams message to I. Mulrennan, S. Mulrennan, and Flannery stating that he would "rather not have to speak with [Ma] at all" and that he does not "need to be questioned by her and John about the status of [their] projects."

135. From as early as around 2021, I. Mulrennan undermined Meyer's authority with other TBS employees by various means, including by encouraging other TBS employees to resist Meyer's staffing choices, by going behind Meyer's back to oppose staffing decisions, and by discouraging cooperation with Meyer's chosen personnel.

136. I. Mulrennan's efforts to undermine Meyer's authority with other TBS employees resulted in reductions in efficiency and productivity and increased costs.

137. On February 9, 2023, I. Mulrennan sent Flannery a Microsoft Teams message stating that he was refusing to comply with John Meyer's decision to re-hire a prior TBS employee, stating "John is hassling me in a call right now to bring back [JDC]" and "[I] keep saying no."

138. On March 24, 2023, I. Mulrennan sent his team a Microsoft Teams message encouraging them to look for a new job or to use a job offer to get a raise at TBS, stating in part that "if you do get another opportunity that pays well you should take it or at least use it against [J]ohn."

139.      From as early as around 2021, I. Mulrennan demonstrated insubordination towards John Meyer by not following TBS company policies and influencing other employees to do the same.

140.      On September 12, 2024, I. Mulrennan sent Flannery a Microsoft Teams message in which he stated that he (I. Mulrennan) was refusing to use his camera in meetings despite it being required under company policy, stating "[i]f they think [I']m turning my camera on then the[y] can fuck off.'"

141.      Upon information and belief, starting in or about 2024, Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery, and Green conspired with StoneTurn to sabotage TBS' operations and to misappropriate TBS' trade secrets for the purpose of getting hired to work at StoneTurn and brining the services that were being provided by TBS to StoneTurn in house at Stoneturn.

**Wyzkowski's Secret Interference With TBS Operations Through Unauthorized Access to Its Computer Systems**

142.      From July 2023 to January 2026, Wyzykowski made unauthorized use of TBS's Microsoft 365 tenant resources to block senders and domains, including landlords, utility companies, mortgage companies, banks, children's daycare providers, children's schools, business partners, family CPAs and accountants, law firms, and personal email addresses associated with former employees.

143.      Wyzykowski's unauthorized use of TBS's Microsoft 365 tenant resources was conducted covertly without the knowledge of Meyer or Ma.

144.      Wyzykowski's unauthorized use of TBS's Microsoft 365 tenant resources harmed TBS's ability to serve its clients, including StoneTurn.

145.    On July 29, 2023, Wyzykowski sent I. Mulrennan a Microsoft Teams message stating that StoneTurn had another vendor lined up to "likely replace" TBS.

146.    On July 30, 2023, Wyzykowski notified John Meyer that he had accepted a job with StoneTurn.

147.    On July 31, 2023, Wyzykowski began working for StoneTurn.

148.    On August 7, 2024, Meyer discovered that Wyzykowski still retained Global Administrator access to TBS' Microsoft 365 tenant.

149.    On August 7, 2024, Meyer questioned I. Mulrennan as to why Wyzykowski continued to hold a high level of privileged access to TBS's computer systems when Wyzykowski was working for StoneTurn.

150.    On August 7, 2024, Meyer issued a verbal warning to I. Mulrennan for allowing Wyzkowski continued privileged access to TBS's computer systems.

151.    On August 7, 2024, Meyer arranged for Wyzykowski's Global Administrator privileges to be terminated.

152.    On February 3, 2025, Meyer was hospitalized in critical condition, unable to oversee company operations.

153.    On February 4, 2025, Ma informed Wyzykowski of Meyer's critical condition.

154.    On February 4, 2025, Ma informed Wyzykowski that she was going to shift her "priorities away from work" so that she could focus on Meyer's health.

155.    On February 5, 2025, Wyzykowski took advantage of Meyer's critical condition and Ma's attention being shifted away from company operations to regain unauthorized access to TBS systems.

156.     Wyzykowski and Green took advantage of Meyer's hospitalization and critical illness to reactivate Wyzykowski's TBS account.

157.     On February 5, 2025, while Meyer was hospitalized, Green asked a TBS employee to reset Wyzykowski's Microsoft access and credentials and to assign a license to Wyzykowski's TBS account, using a false excuse as to why he needed the account to be reset.

158.     Shortly after Wyzykowski's password was reset on February 5, 2025, multiple deletions occurred in Wyzykowski's SharePoint and ExhangeOnline email accounts.

159.     Upon information and belief, Wyzkowski made these deletions in his SharePoint and ExchangeOnline email accounts shortly after his password was reset.

160.     Upon information and belief, Wyzkowski made these deletions to cover up his tortious conduct and breaches of his contractual obligations to TBS.

161.     After Wyzykowski's account was reactivated on February 5, 2025, TBS observed an increase in administrative activity, including apparent re-provisioning, object recreation anomalies, and policy changes.

162.     On the same day that Wyzykowski's account was reactivated, a rehydration event occurred in TBS' Tenant system, resetting TBS's system and deleting valuable files.

163.     This rehydration event left TBS vulnerable as it created a token in the Tenant application which allowed external users to access the TBS application and private company information without the need for a username or password.

164.     On February 5, 2025, Wyzykowski sent confidential information belonging to another TBS client to his personal email address.

165.     TBS' NinjaOne software allows the company to access and service their clients' computers remotely.

166. On February 28, 2025, Wyzykowski deleted all StoneTurn devices from TBS's NinjaOne platform within a one-minute period.

167. TBS did not authorize the deletion of StoneTurn devices from TBS's NinjaOne platform that occurred on February 28, 2025.

168. Wyzkowski conducted the February 28, 2025, NinjaOne deletion in secret and never informed Meyer or Ma about it. TBS was able to determine that Wyzkowski was responsible for the bulk deletion through a review of NinjaOne activity entries.

169. By deleting all StoneTurn devices from TBS's NinjaOne platform, Wyzykowski eliminated TBS's ability to service any StoneTurn computer.

170. TBS's contract with StoneTurn was still in place for another month after Wyzkowski deleted StoneTurn's computers from TBS's NinjaOne account and did not expire until March 31, 2025.

171. Upon information and belief, Wyzkowski deleted all StoneTurn devices from TBS's NinjaOne platform with the knowledge and consent of StoneTurn, which intended to prevent TBS from fulfilling its contractual obligations to StoneTurn and pursuant to an agreement that Wyzkowski would leave his employment with TBS and go in house at StoneTurn, form which position he would service StoneTurn's computers and other devices.

172. On February 28, 2025, StoneTurn's Vice President of Operations Kevin Williams emailed TBS stating that StoneTurn had decided to terminate its IT support services with TBS effective March 31, 2025.

173. StoneTurn would not have terminated its relationship with TBS had it not had access to TBS's misappropriated trade secrets.

21

174. On February 28, 2025, Williams requested that TBS delete StoneTurn's organization and all associated devices from the Ninja dashboard.

175. When Williams sent his February 28, 2025 request to TBS, Wyzykowski had already deleted the StoneTurn devices from TBS's NinjaOne system.

176. I. Mulrennan started to work for StoneTurn no later than on March 5, 2025, before the termination of StoneTurn's contract with TBS on March 31, 2025.

177. I. Mulrennan's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

178. S. Mulrennan started to work for StoneTurn no later than March 5, 2025, before the termination of StoneTurn's contract with TBS on March 31, 2025.

179. S. Mulrennan's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

180. Flannery started to work for StoneTurn no later than March 5, 2025, before the termination of StoneTurn's contract with TBS on March 31, 2025.

181. Flannery's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

182.    On March 28, 2025, Crushell & Co. sent a letter to I. Mulrennan after TBS learned that he was being employed by StoneTurn.

183.    The March 28, 2025 Crushell & Co. letter to I. Mulrennan reminded him that, during his employment with TBS, he had access to confidential and proprietary information, including business affairs, financial information, trade secrets, technical data, know-how, client information, supplier information, and management information.

184.    The March 28, 2025 Crushell & Co. letter to I. Mulrennan also stated that TBS had serious concerns regarding potential data breaches that might need to be reported to the Data Protection Commissioner and required him to confirm continued compliance with post-termination restrictions.

185.    On March 28, 2025, Crushell & Co. sent a letter to S. Mulrennan after TBS learned that she was being employed by StoneTurn.

186.    Crushell & Co.'s March 28, 2025 letter to S. Mulrennan reminded her that, during her employment with TBS, she had had access to confidential and proprietary information, including business affairs, financial information, trade secrets, technical data, know-how, client information, supplier information, and management information.

187.    Crushell & Co.'s March 28, 2025 letter to S. Mulrennan also stated that TBS had serious concerns regarding potential data breaches that might need to be reported to the Data Protection Commissioner and required her to confirm continued compliance with post-termination restrictions.

188.    On March 28, 2025, Crushell & Co. sent a letter to Flannery after TBS learned that he was being employed by StoneTurn.

189. The March 28, 2025 Crushell & Co. letter to Flannery reminded him that, during his employment with TBS, he had access to confidential and proprietary information, including business affairs, financial information, trade secrets, technical data, know-how, client information, supplier information, and management information.

190. The March 28, 2025 Crushell & Co. letter sent to Flannery also stated that TBS had serious concerns regarding potential data breaches that might need to be reported to the Data Protection Commissioner and required him to confirm continued compliance with post-termination restrictions.

191. Section 3 of Crushell & Co.'s March 28, 2025 letters to I. Mulrennan, S. Mulrennan, and Flannery stated "[d]uring the course of your employment, you had access to information that is confidential or proprietary to our Client, including but not limited to information relating to the business products, affairs, or finances of our Client, trade secrets, technical data and know-how belonging to our Client and its supplier, clients, users, customers, agents, distributors, shareholders and management."

192. Section 5 of Crushell & Co.'s March 28, 2025 letters to to I. Mulrennan, S. Mulrennan, and Flannery state that "[y]ou maintain a fiduciary duty not to, at any time prior to or following the termination of your employment with our Client, reveal, publish or disclose, or cause to be revealed, published or disclosed, any confidential information to any person, association, future employer or company."

193. Section 6 of Crushell & Co.'s March 28, 2025 letters to I. Mulrennan, S. Mulrennan, and Flannery stated "you are reminded that you have a contractual obligation not to use any confidential information to your own benefit or the benefit of others without the prior written consent of a duly authorized officer of our Client."

24

**Defendants' Defamatory Statements**

194.    Upon information and belief, Green posted defamatory statements about TBS on Glassdoor on January 8, 2025.

195.    Green's Glassdoor review, posted on January 8, 2025, included false assertions about TBS, including but not limited to asserting that TBS pays most if not all of its employees late.

196.    Green knew this assertion to be false at the time he made them or made them with reckless disregard for the truth.

197.    Upon information and belief, I. Mulrennan and S. Mulrennan posted defamatory statements about TBS on Glassdoor on January 10, 2025.

198.    I. Mulrennan and S. Mulrennan's January 10, 2025 Glassdoor post included false assertions about TBS, including asserting that TBS is a "scam" and that they did not pay him for seven months.

199.    I. Mulrennan and S. Mulrennan's knew these assertions to be false at the time they made them or made them with reckless disregard for the truth.

200.    Upon information and belief, Flannery posted defamatory statements about TBS on Glassdoor on January 28, 2025.

201.    Flannery's January 28, 2025 Glassdoor post included false and defamatory assertions about TBS, including but not limited to:

    a.    "'Boss' withheld payments with every excuse possible"

    b.    "Unpaid wages"

    c.    "Employer has not in over 5 years of employment. Paid invoices/wages on time."

    d.    "Management passive aggressive, undermining, insulting."

25

e. "Discouraging of taking vacation."

f. "Unable to fully switch off, i.e. was not viable to go no contact on vacations, always had to log on to do quick task."

g. "Abuse and bullying from management"

h. "Retaliation from management asking about said late wages"

i. "Company mandated positive Glassdoor review"

202. Flannery knew these assertions to be false at the time he made them or made them with reckless disregard for the truth.

**Harms Caused by Defendants to TBS**

203. Prior to Defendants' tortious actions and contract breaches interfering with TBS's relationship with StoneTurn, StoneTurn was paying TBS approximately $30,000 per month.

204. From approximately July 31, 2023 to March 31, 2025, Defendants' actions diverted approximately $13,000 per month in revenue away from TBS for a total diversion of approximately $260,000 during this twenty-month period.

205. As a result of Defendants' tortious actions and contract breaches, TBS has had no revenue from StoneTurn since March 31, 2025, a loss of $30,000 per month from the monthly revenue that TBS would have had without Defendants' tortious actions and contract breaches. TBS's financial losses from March 31, 2025 to present caused by Defendants therefore total approximately $420,000 and continue to accumulate.

206. The termination of TBS's relationship with StoneTurn has cost TBS approximately $17,000 per month in lost revenue from March 31, 2025 to present.

207. The termination of the StoneTurn's contract with TBS has cost TBS approximately $272,000 in lost revenue from March 31, 2025 to present.

208.     From 2018 to 2024, TBS overpaid Defendants by more than $395,000, as a result of Defendants' overbilling.

209.     I. Mulrennan caused TBS to overpay him by improperly calculating work hours from 2018 to January 10, 2025.

210.     I. Mulrennan caused TBS to overpay him by using unapproved pay rates from 2018 to January 10, 2025.

211.     From 2018 to 2024, TBS overpaid I. Mulrennan by more than $188,000.

212.     S. Mulrennan caused TBS to overpay her by improperly calculating work hours from 2018 to January 10, 2025.

213.     S. Mulrennan caused TBS to overpay her by using unapproved pay rates from 2018 to January 10, 2025.

214.     From 2018 to 2024, TBS overpaid S. Mulrennan by more than $101,000.

215.     Flannery caused TBS to overpay him by improperly calculating work hours from 2018 to January 10, 2025.

216.     Flannery caused TBS to overpay him by using unapproved pay rates from 2018 to January 10, 2025.

217.     From 2018 to 2024, TBS overpaid Flannery by more than $106,000.

218.     The false statements published by I. Mulrennan on January 10, 2025 on Glassdoor harmed TBS's reputation.

219.     The false statements published by S. Mulrennan on January 10, 2025 on Glassdoor harmed TBS's reputation.

220.     The false statements published by Flannery on January 28, 2025 on Glassdoor harmed TBS's reputation.

221.    The statements published by Green on January 8, 2025 on Glassdoor harmed TBS's reputation.

## COUNT I – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)

222.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 221, above.

223.    TBS has current and future advantageous business relationships with its employees and clients.

224.    TBS had a contract to provide IT services to StoneTurn from June 1997 to March 2025.

225.    TBS had an advantageous business relationship with I. Mulrennan from 2015 through 2025.

226.    TBS had an advantageous business relationship with S. Mulrennan from 2018 through 2025.

227.    TBS had an advantageous business relationship with Flannery from 2016 through 2025.

228.    Wyzykowski knew or should have known of TBS's current and future advantageous business relationships, including its relationship with StoneTurn.

229.    Wyzykowski worked with StoneTurn's client account while employed at TBS until July 30, 2023.

230.    I. Mulrennan worked with StoneTurn's client account while employed at TBS until January 10, 2025.

28

231.    S. Mulrennan worked with StoneTurn's client account while employed at TBS until January 10, 2025.

232.    Flannery worked with StoneTurn's client account while employed at TBS until January 10, 2025.

233.    I. Mulrennan worked closely with Wyzykowski on multiple projects for TBS during Wyzykowski's employment at TBS.

234.    I. Mulrennan worked with StoneTurn's client account while employed at TBS until January 10, 2025.

235.    S. Mulrennan worked closely with Wyzykowski on multiple projects at TBS during Wyzykowski's employment at TBS.

236.    S. Mulrennan worked with StoneTurn's client account while employed at TBS until January 10, 2025.

237.    Flannery worked closely with Wyzykowski on multiple projects at TBS during Wyzykowski's employment at TBS.

238.    Flannery worked with StoneTurn's client account while employed at TBS.

239.    Green worked closely with Wyzykowski on multiple projects at TBS during Wyzykowski's employment at TBS.

240.    Green worked with StoneTurn's client account while employed at TBS.

241.    On July 31, 2023, Wyzykowski knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by breaching his the non-solicitation provision of his Non-Compete Agreement.

242.    Wyzykowski knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by using TBS trade secrets to provide services for StoneTurn beginning on July 31, 2023.

243.    On February 5, 2025, Green knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by providing Wyzykowski and StoneTurn with unauthorized access of TBS's systems and confidential business information.

244.    On or about March 5, 2025, I. Mulrennan knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by breaching the non-solicitation provision of the Non-Compete Agreement he had entered into with TBS.

245.    I. Mulrennan knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by using TBS trade secrets to provide services for StoneTurn beginning on or about March 5, 2025.

246.    On or about March 5, 2025, S. Mulrennan knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by breaching the non-solicitation provision of the Non-Compete Agreement she had entered into with TBS.

247.    S. Mulrennan knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by using TBS trade secrets to provide services for StoneTurn beginning on or about March 5, 2025.

248.    On or about March 5, 2025, Flannery knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive

and means by breaching the non-solicitation provision of the Non-Compete Agreement he had entered into with TBS.

249.    Flannery knowingly and intentionally interfered with TBS's current and future advantageous relationship with StoneTurn through improper motive and means by using TBS trade secrets to provide services for StoneTurn beginning on or about March 5, 2025.

250.    Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery, and Green's interference with TBS's advantageous relationship, both current and future, has caused TBS significant damage, including without limitation, the loss of the StoneTurn contract and monthly profit of $17,000 per month in lost revenue starting March 31, 2025 to present.

251.    Wyzykowski's interference with TBS's advantageous relationship, both current and future, has caused TBS significant damage, including without limitation, the loss of its Ireland employees on January 10, 2025.

252.    TBS has lost approximately $13,000 per month in income from StoneTurn since Wyzykowski began his employment with StoneTurn on July 31, 2023 and diverted StoneTurn's business away from TBS.

253.    StoneTurn's interference with TBS's advantageous relationship, both current and future, has caused TBS significant damage, including without limitation, the loss of its Ireland employees on January 10, 2025.

**COUNT II – M.G.L. c. 93 §42(2) MISAPPROPRIATION OF TRADE SECRETS (STONETURN, MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)**

254.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 253, above.

255.     TBS's proprietary tools and methods for addressing client needs, databases, client lists, employee lists, Confidential Client Information, and other Protected Information and the data they contain constitute protectable trade secrets because they provide TBS with an actual and potential economic advantage from not being generally known to, and not being readily ascertainable by proper means, by those who might obtain an economic advantage from their acquisition, disclosure, or use.

256.     TBS engages in reasonable efforts to protect the employee list and confidential data and their information from unauthorized acquisition, disclosure, or use.

257.     TBS protects its Protected Information by storing these materials on OneDrive, SharePoint, and Teams platforms, which require an authorized username, password, and multi-factor authentication to access.

258.     TBS sent Defendants letters reminding them of their duty to not misappropriate TBS's trade secrets on March 28, 2025.

259.     Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery took TBS's Protected Information and provided it to StoneTurn as part of a scheme to enrich themselves and to terminate TBS's relationship with StoneTurn.

260.     On or about February 5, 2025, Green provided Wyzykowski and StoneTurn with unauthorized access of TBS's systems and confidential business information.

261.     Upon information and belief, when Green provided Wyzykowski and StoneTurn with unauthorized access to TBS Protected Information on February 5, 2025, Green knew full well that Wyzykowski was no longer employed by TBS and was not authorized to access that information and knew that Wyzkowski intended to provide that information to StoneTurn.

262.     Upon information and belief, StoneTurn solicited the individual defendants to take TBS's Protected Information and was fully aware of their actions in doing so.

263.     Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery used TBS's Protected Information to service StoneTurn.

264.     Defendants' unauthorized taking and use of TBS's Protected Information constitutes misappropriation of trade secrets under Mass. Gen. L. c. 93, §42(2).

265.     The Protected Information misappropriated by Defendants includes extensive knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations.

266.     Defendants misappropriated TBS's Protected Information for the purpose of facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

267.     Defendants' misappropriation was willful and malicious.

268.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost employees from January 10, 2025, to present.

269.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost contract and revenue from TBS's contract with StoneTurn from March 31, 2025, to present.

270.     Any future unauthorized use of the trade secret information by defendants irreparably harms TBS.

## COUNT III – COMMON LAW MISAPPROPRIATION OF TRADE SECRETS (STONETURN, MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)

271.	TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 270, above.

272.	TBS's proprietary tools and methods for addressing client needs, databases, client lists, employee lists, Confidential Client Information, and other Protected Information and the data they contain constitute protectable trade secrets because they provide TBS with an actual and potential economic advantage from not being generally known to, and not being readily ascertainable by proper means, by those who might obtain an economic advantage from their acquisition, disclosure, or use.

273.	TBS engages in reasonable efforts to protect the employee list and confidential data and their information from unauthorized acquisition, disclosure, or use.

274.	TBS protects its Protected Information by storing these materials on OneDrive, SharePoint, and Teams platforms, which require an authorized username, password, and multi-factor authentication to access.

275.	TBS sent Defendants letters reminding them of their duty to not misappropriate TBS's trade secrets on March 28, 2025.

276.	Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery took TBS's Protected Information and provided it to StoneTurn as part of a scheme to enrich themselves and to terminate TBS's relationship with StoneTurn.

277.	On or about February 5, 2025, Green provided Wyzykowski and StoneTurn with unauthorized access of TBS's systems and confidential business information.

278.	Upon information and belief, when Green provided Wyzykowski and StoneTurn with unauthorized access to TBS Protected Information on February 5, 2025, Green knew full

well that Wyzykowski was no longer employed by TBS and was not authorized to access that information and knew that Wyzkowski intended to provide that information to StoneTurn.

279.     Upon information and belief, StoneTurn solicited the individual defendants to take TBS's Protected Information and was fully aware of their actions in doing so.

280.     Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery used TBS's Protected Information to service StoneTurn.

281.     Defendants' unauthorized taking and use of TBS's Protected Information constitutes misappropriation of trade secrets under Massachusetts common law.

282.     The Protected Information misappropriated by Defendants includes extensive knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations.

283.     Defendants misappropriated TBS's Protected Information for the purpose of facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

284.     Defendants' misappropriation was willful and malicious.

285.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost employees from January 10, 2025, to present.

286.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost contract and revenue from TBS's contract with StoneTurn from March 31, 2025, to present.

287.     Any future unauthorized use of the trade secret information by defendants irreparably harms TBS.

35

**COUNT IV – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DTSA 18 U.S.C. § 1836 (STONETURN, MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)**

288.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 287, above.

289.    TBS's proprietary tools and methods for addressing client needs, databases, client lists, employee lists, Confidential Client Information, and other Protected Information and the data they contain constitute protectable trade secrets because they provide TBS with an actual and potential economic advantage from not being generally known to, and not being readily ascertainable by proper means, by those who might obtain an economic advantage from their acquisition, disclosure, or use.

290.    TBS' trade secrets are related to a service used in interstate commerce.

291.    TBS engages in reasonable efforts to protect the employee list and confidential data and their information from unauthorized acquisition, disclosure, or use.

292.    TBS protects its Protected Information by storing these materials on OneDrive, SharePoint, and Teams platforms, which require an authorized username, password, and multi-factor authentication to access.

293.    TBS sent Defendants letters reminding them of their duty to not misappropriate TBS's trade secrets on March 28, 2025.

294.    Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery took TBS's Protected Information and provided it to StoneTurn as part of a scheme to enrich themselves and to terminate TBS's relationship with StoneTurn.

295.    On or about February 5, 2025, Green provided Wyzykowski and StoneTurn with unauthorized access of TBS's systems and confidential business information.

36

296.     Upon information and belief, when Green provided Wyzykowski and StoneTurn with unauthorized access to TBS Protected Information on February 5, 2025, Green knew full well that Wyzykowski was no longer employed by TBS and was not authorized to access that information and knew that Wyzkowski intended to provide that information to StoneTurn.

297.     Upon information and belief, StoneTurn solicited the individual defendants to take TBS's Protected Information and was fully aware of their actions in doing so.

298.     Defendants Wyzykowski, I. Mulrennan, S. Mulrennan, Flannery used TBS's Protected Information to service StoneTurn.

299.     Defendants' unauthorized taking and use of TBS's Protected Information constitutes misappropriation of trade secrets under DTSA 18 U.S.C. § 1836.

300.     The Protected Information misappropriated by Defendants includes extensive knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations.

301.     Defendants misappropriated TBS's Protected Information for the purpose of facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

302.     Defendants' misappropriation was willful and malicious.

303.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost employees from January 10, 2025, to present.

304.     Defendants' misappropriation and unauthorized use of TBS's trade secrets has financially harmed TBS in the form of lost contract and revenue from TBS's contract with StoneTurn from March 31, 2025, to present.

305.    Any future unauthorized use of the trade secret information by defendants irreparably harms TBS.

## COUNT V – BREACH OF CONTRACT (MARK WYZYKOWSKI, IAN MULRENNAN, AND EANNA FLANNERY)

306.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 305, above.

307.    In 2017, Wyzykowski agreed to the non-solicitation provision of the Non-Compete Agreement he had entered into with TBS.

308.    TBS' non-solicitation provision in the non-compete agreement prohibited Wyzykowski from "directly or indirectly solicit[ing] business from, or attempt[ing] to sell, license or provide the same or similar products or services as are now provided to, any customer or client of Technology Business Solutions, LLC, nor shall employee use Technology Business Solutions, LLC's existing client's demographic and confidential information to solicit and provide quotes and/or transfer business to any competing entity."

309.    TBS' non-solicitation provision in the non-compete agreement also prohibited Wyzykowski from "directly or indirectly solicit[ing], induc[ing] or attempt[ing] to induce any employee of Technology Business Solutions, LLC to terminate his or her employment with Technology Business Solutions, LLC."

310.    Wyzykowski breached Section 2 of his non-compete agreement with TBS by inducing TBS employees I. Mulrennan, S. Mulrennan, and Flannery to terminate their employment with TBS leading up to their departure on January 10, 2025.

311.    Wyzykowski breached the non-solicitation provision in the non-compete agreement by providing the same service to StoneTurn, a TBS client, as he provided while being employed at TBS.

312.    Wyzykowski breached Section 9 of his employment contract by working for StoneTurn starting July 31, 2023, immediately after he stopped working for TBS.

313.    In 2015, I. Mulrennan agreed to the terms the non-solicitation clause of TBS' Employee Contract.

314.    In 2016, Flannery agreed to the terms of the non-solicitation clause of TBS' Employee Contract.

315.    In 2018, I. Mulrennan agreed to the terms of TBS' Employee Handbook.

316.    In 2018, I. Mulrennan agreed to the terms of TBS' Non-Compete Agreement found in the Employee Handbook.

317.    In 2018, Flannery agreed to the terms of TBS' Employee Handbook.

318.    In 2018, Flannery agreed to the terms of TBS' Non-Compete Agreement found in the Employee Handbook.

319.    Section 2 of the non-compete agreement within employment contract signed by I. Mulrennan, Wyzykowski, and Flannery includes a non-solicitation covenant which states "[f]or a period of one year after the effective date of this Agreement, Employee will not directly or indirectly solicit business from, or attempt to sell, license or provide the same or similar products or services as are now provided to, any customer or client of Technology Business Solutions, LLC, nor shall employee use Technology Business Solutions, LLC's existing client's demographic and confidential information to solicit and provide quotes and/or transfer business to any competing entity. Further, for a period of one year after the effective date of this

Agreement, employee will not directly or indirectly solicit, induce or attempt to induce any employee of Technology Business Solutions, LLC to terminate his or her employment with Technology Business Solutions, LLC."

320.    Section 9 of employment contract signed by I. Mulrennan, Wyzykowski, and Flannery states "[e]mployee shall not solicit the employment of any customer of the Company, during the term of this Agreement and for a period of eighteen (18) months following the date of termination of this Agreement by either party for whatever reason (such period not to include any period(s) of violation or period(s) of time required to enforce any obligations contained in this Agreement), without obtaining the prior written consent of the Company. No provisions within this Section 12 shall limit any right which the Company may have under any statute or at common law."

321.    I. Mulrennan breached the non-solicitation provision in the non-compete agreement by providing the same service to StoneTurn, a TBS client, as he provided while being employed at TBS.

322.    Flannery breached the non-solicitation provision in the non-compete agreement by providing the same service to StoneTurn, a TBS client, as he provided while being employed at TBS.

323.    Flannery breached Section 9 of his employment contract by working for StoneTurn immediately after he stopped working for TBS.

324.    I. Mulrennan breached Section 9 of his employment contract by working for StoneTurn immediately after he stopped working for TBS.

325.    Defendants' breaches of contract harmed TBS in the form of lost employees from January 10, 2025, to present.

40

326.    Wyzykowski, Flannery, and I. Mulrennan's breaches of their contractual obligations to TBS caused TBS to lose approximately $680,000 in revenue to the present date, a loss that continues at a rate of $30,000 per month.

## COUNT VI – 18 U.S.C. § 1030(A)(4) COMPUTER FRAUD AND ABUSE ACT (MARK WYZYKOWSKI)

327.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 326, above.

328.    Wyzykowski accessed a protected computer on February 5, 2025 after his access was taken away.

329.    Shortly after Wyzykowski's password reset on February 5, 2025, multiple deletions occur in Wyzykowski's SharePoint and ExhangeOnline email.

330.    After Wyzykowski's account was reactivated on February 5, 2025, TBS observed a significant increase in administrative activity, including apparent re-provisioning, object recreation anomalies, and policy changes.

331.     Through unauthorized access to TBS's Microsoft 365 tenant resources from July 2023 to January 2026, Wyzykowski, I, Mulrennan, S. Mulrennan, and Flannery blocked senders and domains, including landlords, utility companies, mortgage companies, banks, children's daycare providers, children's schools, business partners, family CPAs and accountants, law firms, and personal email addresses associated with former employees.

332.    Wyzykowski used the information obtained through the unauthorized computer to facilitate I. Mulrennan's transition to StoneTurn and conceal prior unauthorized access.

333.    Wyzykowski used the information obtained through the unauthorized computer to facilitate S. Mulrennan's transition to StoneTurn and conceal prior unauthorized access.

41

334. Wyzykowski used the information obtained through the unauthorized computer to facilitate Flannery's transition to StoneTurn and conceal prior unauthorized access.

335. Wyzykowski used the unauthorized access of TBS computers and systems to cause StoneTurn to cancel its contract with TBS.

**COUNT VII – BREACH OF DUTY OF LOYALTY (MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, AND EANNA FLANNERY)**

336. TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 335, above.

337. In 2006, TBS offered full time employment to Wyzykowski.

338. Wyzykowski accepted TBS's employment offer in 2006.

339. Wyzykowski initially worked on the helpdesk.

340. Wyzykowski later transitioned to Managing Director in 2017.

341. Wyzykowski resigned from TBS on July 30, 2023.

342. Wyzykowski began working for StoneTurn, TBS's client, on July 31, 2023.

343. I. Mulrennan accepted TBS's employment offer in 2015.

344. S. Mulrennan accepted TBS's employment offer in 2018.

345. Flannery accepted TBS's employment offer in 2016.

346. On January 10, 2025, I. Mulrennan resigned from TBS.

347. On January 10, 2025, S. Mulrennan resigned from TBS.

348. On January 10, 2025, Flannery resigned from TBS.

349. As a Managing Director at TBS, Wyzykowski owed a duty of loyalty to TBS.

350. As the Europe Project Manager of TBS, I. Mulrennan owed a duty of loyalty to TBS.

351.    Upon information and belief, I. Mulrennan began working for StoneTurn while he was still employed by TBS.

352.    As a Data Integrity Manager at TBS, S. Mulrennan owed a duty of loyalty to TBS.

353.    Upon information and belief, S. Mulrennan began working for StoneTurn while she was still employed by TBS.

354.    As a Europe Senior Technical Engineer of TBS, Flannery owed a duty of loyalty to TBS.

355.    Upon information and belief, Flannery began working for StoneTurn while he was still employed by TBS.

356.    I. Mulrennan started to work for StoneTurn on or before March 5, 2025, well before the termination of StoneTurn's contract with TBS on March 31, 2025.

357.    I. Mulrennan's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

358.    S. Mulrennan started to work for StoneTurn on or before March 5, 2025, well before the termination of StoneTurn's contract with TBS on March 31, 2025.

359.    S. Mulrennan's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

360. Flannery started to work for StoneTurn on or before March 5, 2025, well before the termination of StoneTurn's contract with TBS on March 31, 2025.

361. Flannery's work for StoneTurn allowed StoneTurn to obtain a deep knowledge of TBS's Microsoft 365 tenant, client systems, privileged-access model, and internal operations, facilitating the transfer of TBS employees to StoneTurn and the cancelation of StoneTurn's contract effective March 31, 2025.

362. I. Mulrennan breached his duty of loyalty to TBS by working for StoneTurn while still being employed by TBS.

363. I. Mulrennan breached his duty of loyalty to TBS by utilizing TBS trade secrets to interfere with TBS' business relationship with StoneTurn.

364. S. Mulrennan breached her duty of loyalty to TBS by working for StoneTurn while still being employed by TBS.

365. S. Mulrennan breached her duty of loyalty to TBS by utilizing TBS trade secrets to interfere with TBS' business relationship with StoneTurn.

366. Flannery breached his duty of loyalty to TBS by working for StoneTurn while still being employed by TBS.

367. Flannery breached his duty of loyalty to TBS by utilizing TBS trade secrets to interfere with TBS' business relationship with StoneTurn.

368. Defendant Wyzykowski breached his duty of loyalty to TBS by utilizing TBS trade secrets to interfere with TBS' business relationship with StoneTurn.

369. Defendants' actions caused StoneTurn to cancel its contract with TBS effective March 31, 2025.

370.      Wyzykowski, Flannery, S. Mulrennan, and I. Mulrennan's breaches of their duties of loyalty to TBS caused TBS to lose approximately $680,000 in revenue to the present date, a loss that continues at a rate of $30,000 per month.

### COUNT VIII – M.G.L. c. 93A UNFAIR BUSINESS PRACTICES (STONETURN, MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, AND EANNA FLANNERY)

371.      TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 370, above.

372.       The parties are engaged in the conduct of trade or commerce within the meaning of M.G.L. c 93A to the extent that such conduct is required for the Plaintiff's G. L. c 93A claim.

373.      The unfair and deceptive trade practices described herein, and the effects of those practices, occurred primarily and substantially within the Commonwealth of Massachusetts.

374.      The acts and practices described herein constitute unfair and/or deceptive acts within the meaning of G. L. c. 93A.

375.      TBS has been damaged and continues to suffer damages as a result of Defendants' unfair and/or deceptive acts and practices.

376.      As a result of Defendants' unfair business practices, TBS has suffered damages of $680,000 to date and continues to suffer damages at a rate of approximately $30,000 per month.

### COUNT IX – CIVIL CONSPIRACY (STONETURN, MARK WYZYKOWSKI, IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)

377.      TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 376, above.

378.     Defendants each knowingly provided substantial assistance to and took affirmative steps to encourage the achievement of a common plan to have StoneTurn cancel its contract with TBS.

379.     Defendants each knowingly provided substantial assistance to and took affirmative steps to encourage the achievement of a common plan to remove the Ireland employees from TBS and have them work for StoneTurn instead.

380.     The actions and activities of the Defendants caused TBS to suffer substantial damage in the form of the loss of the StoneTurn contract.

381.     The actions and activities of the Defendants caused TBS to suffer substantial damage in the form of the loss of institutional knowledge and additional expense of training new employees.

382.     The actions and activities of I. Mulrennan, in combination and conspiracy with Wyzykowski, constitute a conversion of the assets of TBS, which has caused TBS to suffer substantial damage, harm, and loss.

383.     The actions and activities of S. Mulrennan, in combination and conspiracy with Wyzykowski, constitute a conversion of the assets of TBS, which has caused TBS to suffer substantial damage, harm, and loss.

384.     The actions and activities of Flannery, in combination and conspiracy with Wyzykowski, constitute a conversion of the assets of TBS, which has caused TBS to suffer substantial damage, harm, and loss.

385.     The actions and activities of Green, in combination and conspiracy with Wyzykowski, constitute a conversion of the assets of TBS, which has caused TBS to suffer substantial damage, harm, and loss.

386.     The actions and activities of StoneTurn, in combination and conspiracy with Wyzykowski, constitute a conversion of the assets of TBS, which has caused TBS to suffer substantial damage, harm, and loss.

**COUNT X – CONVERSION (IAN MULRENNAN, SARAH MULRENNAN, AND EANNA FLANNERY)**

387.     TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 386, above.

388.     From 2018 to 2024, I. Mulrennan misappropriated TBS funds by giving fraudulent and unauthorized raises to himself and his team, by conspiring with Flannery and S. Mulrennan to inflate their hours worked, and by making unauthorized increases to their hourly rates.

389.     From 2018 to 2024, I. Mulrennan covered up his scheme to overcompensate himself and other members of his team by deleting payroll records, so that fraudulent and inflated transactions could not be traced.

390.     From 2018 to 2024, I. Mulrennan further concealed his fraudulent, unauthorized and inflated payments to himself and his team by not entering them into the third-party time tracking tool provided by TBS to track his team's hours.

391.     On August 23, 2024, I. Mulrennan and Flannery discussed through Microsoft Teams messages how they "came up" with the number of hours worked on a project, communicating these hours to Meyer as being legitimate, despite the actual number of hours worked being lower.

392.     On or about October 17, 2024, I. Mulrennan increased Flannery's rate of pay by twenty percent without authorization and without the knowledge or approval of his supervisors.

393.    On October 17, 2024, I. Mulrennan informed Flannery of this increase in compensation by through Microsoft Teams, telling that he "put in a 20% increase" for Flannery and "said nothing."

394.    In January of 2025, Ma and Meyer conducted a billing review of I. Mulrennan's team.

395.    Through the billing review of I. Mulrennan's team, Meyer and Ma learned that I. Mulrennan had billed TBS for more hours than he and his team worked and that he had discussed this fraudulent activity with S. Mulrennan and Flannery.

396.    Through the billing review, TBS discovered that I. Mulrennan received a yearly compensation which was considerably higher than his authorized salary of €31,000. Specifically, I. Mulrennan arranged for himself to be paid €50,549.91 in 2018, €52,717.52 in 2019, €58,735.40 in 2020, €49,598.48 in 2021, €63,165.64 in 2022, €60,342.06 in 2023, and €70,254.49 in 2024.

397.    I. Mulrennan fraudulently paid himself and his team more than their authorized salaries without TBS's knowledge through the use of a number of tactics, including paying them for more hours than they worked and using inaccurate euro to U.S. dollar conversion rates.

398.    Through the billing review, TBS discovered that from 2018 to 2025 Flannery received a yearly compensation which was higher than his authorized salary of $31,000. Specifically he was paid €35,442.03 in 2018, €44,527.21 in 2019, €45,216.10 in 2020, $39,559.97 in 2021, €52,944.92 in 2022, €50,017.70 in 2023, and €55,974.60 in 2024.

399.    Through the billing review, TBS discovered that from 2018 to 2025 S. Mulrennan was paid far more than her authorized annual salary of $29,500. Specifically, she was paid €36,440.31 in 2018, €38,245.57 in 2019, €42,269.20 in 2020, $41,100.30 in 2021, €53,398.50 in 2022, €48,632.14 in 2023, and €48,117.27 in 2024.

400.    From 2018 to 2024, I. Mulrennan, S. Mulrennan, and Flannery caused TBS to overpay them by more than $395,000.

### COUNT XI – DEFAMATION (IAN MULRENNAN, SARAH MULRENNAN, EANNA FLANNERY, AND ANTHONY GREEN)

401.    TBS re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 400, above.

402.    Upon information and belief, Green posted defamatory statements about TBS on Glassdoor on January 8, 2025.

403.    Green's Glassdoor review, posted on January 8, 2025, included false assertions about TBS, including but not limited to asserting that TBS pays most if not all of its employees late.

404.    Green knew this assertion to be false at the time he made them or made them with reckless disregard for the truth.

405.    Upon information and belief, I. Mulrennan and S. Mulrennan posted defamatory statements about TBS on Glassdoor on January 10, 2025.

406.    I. Mulrennan and S. Mulrennan's January 10, 2025 Glassdoor post included false assertions about TBS, including asserting that TBS is a "scam" and that they did not pay him for seven months.

407.    I. Mulrennan and S. Mulrennan's knew these assertions to be false at the time they made them or made them with reckless disregard for the truth.

408.    Upon information and belief, Flannery posted defamatory statements about TBS on Glassdoor on January 28, 2025.

409.    Flannery's January 28, 2025 Glassdoor post included false and defamatory assertions about TBS, including but not limited to:

    a.   "'Boss' withheld payments with every excuse possible"

    b.   "Unpaid wages"

    c.   "Employer has not in over 5 years of employment. Paid invoices/wages on time."

    d.   "Management passive aggressive, undermining, insulting."

    e.   "Discouraging of taking vacation."

    f.   "Unable to fully switch off, i.e. was not viable to go no contact on vacations, always had to log on to do quick task."

    g.   "Abuse and bullying from management"

    h.   "Retaliation from management asking about said late wages"

    i.   "Company mandated positive Glassdoor review"

410.     Flannery knew these assertions to be false at the time he made them or made them with reckless disregard for the truth.

411.     Defendants' defamatory statements caused TBS to suffer reputational damage and financial harm.

## REQUESTS FOR RELIEF

WHEREFORE, TBS respectfully requests that this Court:

1. Enter judgment for TBS on all Counts of this Complaint;

2. Preliminarily and permanently enjoin Defendants from publishing or otherwise disseminating any defamatory or disparaging statements concerning TBS to third parties;

3. Preliminarily and permanently enjoin Defendants from using any of TBS's trade secret, confidential, or proprietary information;

4. Order Defendants to destroy any of TBS's trade secret, confidential, or proprietary information in its possession, custody, or control within fourteen (14) days of the Court's order;

5. Award TBS damages (including trebled damages), reasonable attorneys' fees, costs, and

interest, as permitted by law; and

6. Grant TBS any such other relief as this Court deems just and proper.

## JURY DEMAND

TBS demands a jury trial on all issues so triable.

Respectfully submitted,
Technology Business Solutions, LLC
By Its Attorneys,

/s/ Kenneth R. L. Parker
Kenneth R. L. Parker (BBO No. 688987)
Nathaniel Lichtin (BBO No. 692764)
Jeffrey Grabow (BBO No. 714046)
Parker Key Law LLC
*Street Address:*
343 Washington St., Suite 200
Newton, MA 02458
Mailing Address:
P.O. Box 590073
Newton, MA 02459
Tel.: (617) 841-2418
Fax: (617) 963-8315
Email: kparker@parkerkeylaw.com

Dated: August 3, 2026

## VERIFICATION

I, the undersigned, am the President of Technology Business Solutions LLC and affirm under the pains and penalties of perjury that the statements made herein are true and accurate, and when my knowledge is based upon information and belief, are true to the best of my knowledge, information and belief, this 3rd day of August, 2026.

/s/ John Meyer
John Meyer
President, Technology Business Solutions LLC